[Cite as *In re T.H.*, 2025-Ohio-344.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re T.H., L.L.

Court of Appeals No.  L-24-1196

Trial Court No.  JC024299131

**<u>DECISION AND JUDGMENT</u>**

Decided:  February 3, 2025

* * * * *

David T. Rudebock, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

**{¶ 1}** This matter is before the court on appeal from the judgment of the Lucas County Court of Common Pleas, Juvenile Division, finding L.L. (d.o.b. 10/23/23) an abused and neglected child, and finding T-L.H. an abused and neglected and dependent child, and granting permanent custody of T-L.H. (d.o.b. 6/13/22) to Lucas County Children Services (LCCS). On March 13, 2024, L.L. died, and the juvenile court made no determination regarding disposition as to L.L. Because we find no error with the trial court's judgment, we affirm.

## II. Facts and Procedural Background

{¶ 2} LCCS first had contact with appellant, mother, in October 2023, after receiving a referral due to mother screening positive for THC at the birth of L.L. At that time, LCCS did not open a case, but instead, mother and father consented to a voluntary case with LCCS beginning in December 2023. Mother and father both agreed to a case plan, and each completed a dual diagnostic assessment and received referrals to a parenting program. Permanency case workers visited the home of the children several times each month from December through the first week of March 2024, and helped with food, supplies, and formula, as well as information on obtaining additional food and formula. Case workers also offered to help mother and father in enrolling the children in protective daycare and arranging a screening for the children through the Help Me Grow program.

{¶ 3} At each visit, case workers noted T-L.H. was usually confined in her bedroom, alone. Mother and/or father claimed T-L.H. was napping, but case workers would find her awake when they checked, or T-L.H. could be heard knocking at the door to be let out. When T-L.H. left her room, she appeared hungry and thirsty and mother and father had minimal food in the home. On one occasion, the case worker observed T-L.H. pick up cups with unidentified contents from the floor and try to drink from these cups. At each visit, case workers stressed the importance of keeping things clean, and

2.

expressed concern over the amount of trash, partially filled cups, cigarette butts, and other debris within T-L.H.'s reach.

{¶ 4} Father was the primary caregiver while mother worked, and mother rejected protective daycare for both children. During visits, case workers observed very little interaction between mother and children, with no signs of bonding, attachment, or affection. They noted mother often lay on the couch during case worker visits. The only time case workers saw mother holding T-L.H., case workers observed mother grab T-L.H.'s arm and lift her "aggressively" by the arm to mother's hip. Mother also had concerns about speech delays for T-L.H., but refused the services of Help Me Grow to address these concerns.

{¶ 5} L.L. required specialized baby formula, and case workers helped obtain some formula and provided mother with information on obtaining more. Mother did not follow up on acquiring formula through any agency and did not report any problems obtaining more formula until after she began supplementing L.L.'s diet with diluted whole milk for at least a week and possibly a month. Mother and father also misled case workers, claiming they took L.L. to his gastroenterologist appointment when they did not. When a case worker asked about a greenish-yellow bruise on T-L.H.'s forehead, mother claimed it was a birthmark and not a bruise, but LCCS had never noted any birthmark, and the mark eventually disappeared.

3.

**{¶ 6}** In December 2023, LCCS received a second referral, alleging injury to the children, poor parenting, and poor living conditions. After a home visit, the condition of the home was deemed poor, but examination of the children indicated no injuries.

**{¶ 7}** In February 2024, LCCS spoke to mother and father about another referral, alleging domestic violence. Mother denied any incident occurred, even though mother called police to report that father assaulted her. Father acknowledged that the two had pushed each other and then father left the home. Neither expressed safety concerns to LCCS, but the case worker did learn of an incident at mother's work that involved mother and a co-worker and resulted in a police response. Mother's version of the incident did not match the police report in that instance.

**{¶ 8}** On March 5, 2024, one of the case workers performed a brief home visit in the early morning. It was a scheduled visit, but father indicated the children were sleeping and mother was at work and asked to reschedule. The case worker attempted to enter L.L.'s room to check on him, but father prevented access and asked to reschedule when mother was home. The next day, another case worker made a scheduled visit to the home. Father, again, asked to reschedule because mother was at work. The case worker briefly saw T-L.H., and observed L.L. swaddled in the pack-and-play.

**{¶ 9}** Soon after, LCCS received a referral, based on L.L.'s hospitalization with nonaccidental injuries, including liver and brain injuries. Dr. Randall Schlievert, an expert in child abuse, examined L.L. in the hospital and noted bruising above the right eye, a retinal hemorrhage of the right eye, and subdural hematoma on both sides of the

4.

brain. Blood tests revealed liver injury, and none of these acute injuries were attributable to an existing condition or a genetic or accidental cause.

{¶ 10} LCCS initially placed T-L.H. with a relative on an out-of-home safety plan, and mother was permitted to visit T-L.H. at the relative's home. After an incident in the relative's home that caused safety concerns, LCCS placed T-L.H in a foster placement.

{¶ 11} On March 12, 2024, T-L.H. had a full skeletal x-ray, which revealed a healed fracture of her right forearm/wrist. Dr. Schlievert reviewed the x-ray and determined T-L.H. had a healing fracture, approximately 10-12 weeks old. Dr. Schlievert determined the injury was likely non-accidental and consistent with a child being yanked up by the arm. He also indicated the x-ray showed re-injury after the initial fracture.

{¶ 12} On March 13, 2024, L.L. died after being removed from life support. Father was charged with aggravated murder, murder, endangering children, and felonious assault arising from the death of L.L.

{¶ 13} On March 22, 2024, LCCS filed a complaint in dependency, neglect, and abuse and motion for a shelter care hearing regarding T-L.H. The juvenile court awarded interim custody to LCCS.

{¶ 14} On April 2, 2024, mother and maternal grandmother were both charged with domestic violence and assault, following an incident in grandmother's home. Police noted both were aggressors in the incident. The charges for each were later reduced to disorderly conduct.

5.

{¶ 15} On March 21 and April 2, 2024, LCCS held case conferences. A maternal uncle attended on March 21, and he reported seeing bruises on T-L.H. everywhere but her face. When he asked mother about the bruises, mother indicated father told her T-L.H. was clumsy.

{¶ 16} During this period, mother told LCCS that father had been violent with her, and mother knew of father's anger issues but believed he would not harm a child. This contradicted mother's representations to LCCS throughout the case, in which mother denied domestic violence occurred. Mother suggested that father caused T-L.H.'s broken arm, stating she had witnessed father yanking T-L.H. up by her arm. Despite this, mother acknowledged she continued to leave the children with father as primary caregiver while she worked. But after L.L.'s hospitalization, mother told LCCS that she was finished with father and she was afraid of father.

{¶ 17} Following the March 21 conference, mother re-engaged with her mental health services, with sporadic attendance. While mother made progress with boundaries and expressing emotions, she did not engage in domestic violence services and never disclosed any anger problems or her own domestic violence charges. Mother also visited T-L.H. at the agency but was observed trying to interact with other adults in the room more than her child. Mother also provided possible relative placements to LCCS to investigate, including her biological father, an individual who had sexually abused mother when she was a young child.

6.

{¶ 18} Despite this history of abuse, mother told LCCS her father was an appropriate placement, causing LCCS to doubt mother's judgment. LCCS also considered mother's lack of regret regarding placing the children in father's care an indicator of poor judgment. Finally, LCCS noted mother was not candid regarding her own violence and anger issues, and did not seek to address these issues through counseling, focusing instead on her relationship issues with a new partner. Based on mother's lack of accountability, relative to the death of L.L. and T-L.H.'s care and well-being, LCCS did not believe any case plan services could ensure T-L.H. could be safely placed with mother.

{¶ 19} After the case conferences, LCCS received information that demonstrated mother and father remained in contact after the death of L.L., and before father was arrested, mother instructed him to "lay low."

{¶ 20} On April 12, 2024, LCCS filed an amended complaint in dependency, neglect and abuse, seeking permanent custody.

{¶ 21} On May 23 and 31, 2024, the juvenile court held an adjudicatory hearing. During the adjudicatory hearing, and after father was moved away from mother at her request, the two were observed trying to communicate and mouthing "I love you," to each other.

{¶ 22} On June 14, 2024, the juvenile court entered judgment, finding by clear and convincing evidence that T-L.H. is an abused, neglected, and dependent child pursuant to

7.

R.C. 2151.031, 2151.03, and 2151.04, and that L.L. is an abused and neglected child pursuant to R.C. 2151.031 and 2151.03.

{¶ 23} On June 17, 2024, the juvenile court held a hearing on permanent custody as to T-L.H. Mother appeared for the hearing but did not testify. The juvenile court heard testimony from the police officers involved in mother's domestic violence arrest, the LCCS case workers, and the guardian ad litem assigned to T-L.H. Mother's counselor, the maternal grandmother, and a maternal uncle testified on mother's behalf.

{¶ 24} On July 11, 2024, the juvenile court issued its judgment, finding T-L.H. could not be placed with mother based on factors enumerated at R.C. 2151.414(E)(14), (15), and (16).

{¶ 25} The juvenile court found that mother "has not acknowledged any role her own choices played in what happened to [T-L.H. or L.L.]." The juvenile court found that under R.C. 2151.414(E)(14), mother demonstrated "an unwillingness to prevent [T-L.H.] from suffering physical abuse or neglect."

{¶ 26} The juvenile court also found that both parents committed abuse or caused a child to suffer neglect, with the seriousness, nature, or likelihood of recurrence of abuse that posed a threat to safety should T-L.H. be placed with mother. The juvenile court found that under R.C. 2151.414(E)(15), L.L. died from his injuries and T-L.H. was also injured, and additionally, T-L.H. "was frequently closed in her room alone, and frequently hungry or thirsty when she was let out of her room."

8.

**{¶ 27}** Finally, the juvenile court found that father was criminally charged as a result of L.L.'s death, and the parents appear to be continuing their relationship despite the children's injuries and L.L.'s death. Therefore, the juvenile court found R.C. 2151.414(E)(16) applied, preventing placement with mother.

**{¶ 28}** After considering the factors under R.C. 2151.414(D), the juvenile court determined that a grant of permanent custody to LCCS was in the best interest of T-L.H. The juvenile court found that T-L.H. no longer spends her days in a closed room, alone, but is bonding with her foster parents and making progress developmentally. While T-L.H. is unable to express her wishes, the guardian ad litem testified that permanent custody is in T-L.H.'s best interests. Based on the lack of approval for home studies for relatives, T-L.H. had been in foster care since March 22, 2024. The juvenile court found T-L.H. needed a legally secure permanent placement that is safe, and no appropriate relatives had been identified to date. The court further found that no factors in R.C. 2151.414(E)(7) to (11) applied.

**{¶ 29}** The juvenile court awarded permanent custody of T-L.H. to LCCS. Because L.L. was deceased, the court determined a dispositional order regarding L.L. was not possible.

**{¶ 30}** This appeal followed.

9.

### III. Assignment of Error

**{¶ 31}** On appeal, mother asserts the following assignments of error:

1. The trial court abused its discretion when it found that Child 1 cannot be placed within a reasonable time or should not be placed with either parent, pursuant to R.C. 2151.414(E)(14).

2. The trial court abused its discretion when it found that Child 1 cannot be placed within a reasonable time or should not be placed with either parent, pursuant to R.C. 2151.414(E)(16).

### IV. Analysis

**{¶ 32}** In challenging the juvenile court's decision, mother challenges specific factual findings by the court. In her first assignment of error, she argues she consistently maintained employment to provide for her children's needs, and therefore demonstrated a willingness "to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect." *See* R.C. 2151.414(E)(14). In her second assignment of error, she argues that father's criminal charges arising from the death of L.L. and mother's "supportive behavior" toward father, despite father's conduct, is irrelevant as a factor in considering whether T-L.H. should be placed with her. *See* R.C. 2151.414(E)(16).

**{¶ 33}** Mother does not challenge the juvenile court's finding under R.C. 2151.414(E)(15), relative to the injuries inflicted upon L.L. and T-L.H., and mother's lack of acknowledgement that father was a known perpetrator of domestic violence and her choice to continue leaving the children with father as their primary caregiver.

10.

**{¶ 34}** The juvenile court awarded permanent custody of T-L.H. pursuant to R.C. 2151.353(A)(4), which permits a complaint for permanent custody without first offering case plan services and a path toward reunification. *In re S.J.,* 2024-Ohio-5137, ¶ 23. In adjudicating a complaint for permanent custody, a juvenile court must make two findings: First, the juvenile court must find "in accordance with division (E) of section 2151.414 that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent[.]" R.C. 2151.353(A)(4). Second, the juvenile court must determine "in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4). Mother's assignments of error challenge only the trial court's first finding pursuant to R.C. 2151.414(E).

**{¶ 35}** Mother argues that the juvenile courts' findings under R.C. 2151.414(E) constituted an abuse of discretion. However, we review a juvenile court's judgment, awarding permanent custody under R.C. 2151.353(A)(4) to determine whether it is supported by clear and convincing evidence. *In re I.H.,* 2020-Ohio-4853, ¶ 33 (6th Dist.), citing *In re B.K.,* 2017-Ohio-7773, ¶ 16 (6th Dist.) (additional citation omitted).

**{¶ 36}** "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

11.

We will not reverse a judgment on permanent custody as against the manifest weight of the evidence where the record contains some competent, credible evidence by which the court could have formed a firm belief as to the essential statutory factors for termination of parental rights. *In re Denzel M.*, 2004-Ohio-3982, ¶ 8 (6th Dist.), citing *In re S.,* 102 Ohio App.3d 338, 344-345 (6th Dist.1995).

{¶ 37} As mother only challenges the juvenile court's findings relative to R.C. 2151.414(E), we limit our review to these initial findings required under 2151.353(A)(4), noting mother does not challenge the determination regarding the best interest of the child.

{¶ 38} In her assignments of error, mother argues the juvenile court's findings under R.C. 2151.414(E)(14) and (16) are inconsistent with the record. Mother does not challenge the court's findings under R.C. 2151.414(E)(15).

{¶ 39} R.C. 2151.414(E) addresses the determination of whether a child cannot or should not be placed with a parent within a reasonable time, considering all relevant evidence. *See* R.C. 2151.414(E). "If the court determines, by clear and convincing evidence, at a hearing held pursuant to … division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."

12.

**{¶ 40}** The juvenile court, in this case, determined the following applied:

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

R.C. 2151.414(E)(14) – (16).

**{¶ 41}** As an initial matter, we note that a finding as to any one of the factors under R.C. 2151.414(E) supports the conclusion that the child cannot or should not be placed with a parent within a reasonable time. *In re S.J.,* 2024-Ohio-5137, ¶ 29 (6th Dist.), citing *In re D.C.,* 2008-Ohio-5292, ¶ 26 (6th Dist.). Here, mother does not dispute the juvenile court's finding that she either committed or permitted neglect or abuse, and the "seriousness, nature, or likelihood of recurrence" of the neglect or abuse posed a threat to T-L.H.'s safety. The record supports the juvenile court's determination as to this factor,

13.

and therefore, supports the juvenile court's judgment awarding custody based on this factor, alone.

{¶ 42} The record also supports the juvenile court's findings as to R.C. 2151.414(E)(14) and (16). First, as to (E)(14), the record demonstrated that mother showed an unwillingness to prevent T-L.H. from suffering abuse and neglect. Mother did not acknowledge the effect of her choices on either of the children. Furthermore, she knew father closed T-L.H. in her room most of the day and she knew father was capable of domestic violence. Still, mother continued to place the children in father's care, rejecting the option of protective daycare.

{¶ 43} In challenging these facts, mother argued she was the one who worked to provide food and necessities for the family. However, mother does not address the evidence regarding father's treatment of the children, or her knowledge and disregard of this treatment. Poor decisions regarding the danger posed by another will satisfy the findings under R.C. 2151.414(E)(14). *See, e.g., In re Kayla H.,* 2007-Ohio-6128, ¶ 54 (6th Dist.) (continuing to cohabit with a pedophile demonstrated an unwillingness to prevent the child from suffering abuse); *In re A.J.,* 2014-Ohio-421, ¶ 55 (6th Dist.) (poor judgment in permitting strangers unsupervised access to child and "conscious disregard" of abuse allegations demonstrated unwillingness to prevent abuse); *In re Anisha N.,* 2003-Ohio-2356, 2003 WL 21040311, * 7 (6th Dist.) (parents refusal to address anger management issues created a threat for children).

14.

**{¶ 44}** As to the "any other factor" under (E)(16), mother argues that father's criminal conduct should not be attributed to her. As an additional factor, the trial court found that father was facing criminal trial for the death of L.L., and while mother claimed she was no longer in a relationship with father, mother and father communicated in the courtroom, mouthing, "I love you," to each other, leading the juvenile court to conclude that mother either remains in a relationship with father, or desires such a relationship, despite L.L.'s death.

**{¶ 45}** Mother argues that this observation is irrelevant as to whether T-L.H. can or should be placed with her. However, we have previously found such conduct relevant under R.C. 2151.414(E)(16). In *In re B.K.,* 2010-Ohio-3329 (6th Dist.), we noted similar conduct demonstrated as a failure to "internalize the need and significance of protecting" the child. *In re B.K.* at ¶ 60. In that case, the continued relationship with the abusive partner demonstrated mother's lack of understanding of risk factors and her inability to understand how to protect the child. *Id.* In this case, the record demonstrated mother's continued relationship with father, despite the death of L.L. while in his care. Mother's inability to comprehend and internalize father's conduct, therefore, supports the juvenile court's findings under R.C. 2151.414(E)(16).

**{¶ 46}** Based on our review of the record, limited to the challenge to the court's findings under R.C. 2151.414(E) as asserted by mother, we therefore find the juvenile court's judgment is supported by clear and convincing evidence. Accordingly, mother's first and second assignments of error are not well-taken.

15.

## V. Conclusion

**{¶ 47}** Finding substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas, Juvenile Division.  Appellant, mother, is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

_____
JUDGE

Myron C. Duhart, J.

_____
JUDGE

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.