**[Cite as *In re Am.J.*, 2025-Ohio-1289.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re Am.J.

Court of Appeals No.  L-24-1226

Trial Court No.  JC024299563

**DECISION AND JUDGMENT**

Decided:  April 11, 2025

* * * * *

Rebecca L. West-Estell, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, K.J. ("mother"), appeals the August 28, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her child, Am.J. ("child"), to appellee, Lucas County Children Services ("LCCS").  The trial court also terminated the parental rights of child's father, L.M. Sr. ("father"), who is not a party to this appeal.  For the following reasons, we affirm.

## I. Background and Facts

## A. Complaint and adjudication

{¶ 2} On April 22, 2024, LCCS filed a complaint alleging that child was dependent. The complaint alleged that the agency received a referral about child because mother had lost custody of five other children. Additionally, the family had a history of involvement with LCCS based on concerns about physical abuse, domestic violence, neglect, parenting, and mental health challenges. In 2018, mother lost custody of four children; the trial court awarded maternal grandmother legal custody of one child and LCCS permanent custody of the other three. At the time, the court found that mother "failed to implement skills from parenting classes and domestic violence services" and was unable to provide the children with an adequate permanent home because of "chronic illness and intellectual disability." The trial court awarded LCCS permanent custody of a fifth child in 2023. The agency learned that mother had completed a parenting class at one agency, was enrolled in a parenting class at a second agency, was "engaged with a pregnancy center[,]" and had a mental health appointment scheduled. Under this complaint, LCCS was seeking to reunify mother and child.

{¶ 3} At the shelter care hearing, the trial court granted LCCS interim temporary custody of child.

{¶ 4} On May 21, 2024, the agency filed an amended complaint seeking original permanent custody of child under R.C. 2151.353. It alleged that permanent custody was in child's best interest because of (1) mother's "continued failure to appropriately care for the child and keep her safe despite supportive services and instruction . . ." and failure to

2.

complete case plan services; (2) her "[c]hronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency . . .";  and (3) the fact that she had lost permanent custody of her other children and "[t]here were concerns for [mother's] cognitive delays and ability to safely parent in those cases as well[,]" which "have not been remedied."

{¶ 5} At the adjudication hearing, mother consented to a dependency finding.  The magistrate found that child was dependent, and the trial court adopted the magistrate's decision.

## B. Permanent custody hearing

{¶ 6} At the permanent custody hearing, LCCS presented the testimony of LCCS caseworkers, Brittany Cannon, Hannah Posey, and Sasha Street; child's foster mother, K.W.; and guardian ad litem, Lance Brown.  Mother testified in her own behalf.

### 1. Caseworkers' testimony

{¶ 7} Cannon, the assessment caseworker assigned to mother's case, testified that this case was reported as a dependency case when mother gave birth to child.  Although there were no concerns for abuse or neglect, the referrer "called because of [mother's] history" with LCCS.  In 2018, LCCS got a referral about the family because one of the older children (who was younger than five years old) had broken his collarbone.  The agency substantiated a finding of abuse against father related to that injury.  While the 2018 case was open, mother successfully completed domestic violence classes and three different parenting classes.  However, according to the case closure notes, mother "couldn't grasp the material she was learning which was part of the factors as to why her

3.

children were removed." Cannon said that all of mother's providers had concerns at the end of the 2018 case, including "[g]eneral safety concerns that mom wasn't grasping the understanding of basic safety when it comes to her children and wasn't understanding the basic concepts of like structure or routines or things that kids need to thrive." This resulted in LCCS removing four children from mother's care, the trial court awarding legal custody of the oldest child to maternal grandmother and terminating mother's parental rights to the three younger children, and the three younger children being adopted.

{¶ 8} In 2022, mother gave birth to another child, and LCCS opted to seek original permanent custody of that child. As a result, the agency did not offer mother any case plan services, but mother successfully completed a parenting class on her own. That provider "noted the same concerns with basic safety and overall understanding of parenting." The trial court terminated mother's parental rights to this child.

{¶ 9} LCCS opened this case in April 2024 when mother gave birth to child. Cannon was the assessment worker who attended the crisis staffing meeting related to child. At this point, the agency was not sure if it was going to seek original permanent custody, and Cannon did not feel comfortable deciding to file for original permanent custody after "only knowing the family for 20 minutes." Instead, the agency postponed its decision to gather more information about the parents. Cannon conducted the investigation.

{¶ 10} In the course of her investigation, Cannon visited child at her foster home, spoke to maternal grandmother and maternal aunt, and received documents from

4.

providers that mother has worked with. She did not have any concerns from her visit to child's foster home.

{¶ 11} Maternal grandmother and maternal aunt were rejected as potential placements for child because there were "a lot of concerns when it came to maternal grandmother's ability to support, to protect, to be able to recognize any safety issues or putting children in harmful positions[,]" and maternal aunt, who was living with maternal grandmother, "just kind of went along with what maternal grandmother was doing, saying, [and] thinking . . . ." The agency did not find any other relatives that it could place child with. Mother suggested a former coworker as a potential placement.

{¶ 12} Cannon learned that father violated a protection order that mother had against him in 2018. She was not aware of any new incidents after mother and father took domestic violence classes as part of the 2018 case.

{¶ 13} Two of the agencies where mother took parenting classes "had nothing but positive things to say about her compliance, her attendance, her willingness to engage, [and] her willingness to learn." However, there were "safety concerns" during mother's parenting observations. For example, mother struggled with properly securing a child in a car seat, despite being taught several times how to do it correctly; once left a child under one year old on a chair when she went to get something, without considering that the child could fall off of the chair; and did not "respond right away" to get a child who ran out of the office while mother was at an appointment. When the providers asked follow-up questions after these incidents (for example, how to prevent similar incidents in the future), there were "simple things that [mother] couldn't really answer."

5.

Essentially, mother could "recite the information that was given to her, she just couldn't make those changes herself to do them."

{¶ 14} Cannon did not refer mother to any services because mother was already connected to the services. For instance, when Cannon met mother, she had already scheduled an appointment with a mental health provider, so Cannon did not refer her to mental health services.

{¶ 15} Going into the follow-up staffing meeting in May, the agency was still unsure about filing for original permanent custody. To help with that decision, the caseworkers in attendance asked mother "a lot of . . . basic parenting questions . . . [,]" such as what she should do for a baby when they wake up in the morning, when a baby starts eating solid foods, and when a baby starts sitting up. There were questions that mother was not answering "appropriately to the point where it was getting a little concerning." Regarding her relationship with father, mother was able to "identify red flags" in the relationship but would not "make a decision to prevent these red flags from happening." For example, mother could recognize that she needed to stop an argument with father that was escalating but continued to allow him to stay with her at her apartment. Cannon found this concerning because mother was not "making those clear boundaries and those cut-offs to say this is not a healthy person to be around you, it's not a healthy person to be around your child . . . ."

{¶ 16} Following the May meeting, the agency opted to file for original permanent custody of child based on Cannon's investigation and recommendation. It was a "very difficult decision," but she "just didn't feel like [she] could say that a child would be safe

6.

or that as many parenting classes as we could offer, if [mother has] already done so many, [she] just didn't know what one more parenting class would do to kind of help grasp the information that was being presented to her."

{¶ 17} On cross-examination, Cannon said that she explained to mother at the crisis staffing meeting that the agency was not going to decide on permanent custody for a couple of weeks. Mother's caseworkers told her to continue with the parenting class she was enrolled in because it would be beneficial to her regardless of the agency's decision. They talked about some providers that mother wanted to use, and Cannon learned later that mother had reached out to them before Cannon had a chance to call. She explained to these providers that the agency had not determined "what case plan services looked like" in this case, so the providers "were on hold to work with her until we made a decision." Cannon "didn't have to make referrals because [mother] was already connected with a lot of [the providers]." She did not consider having mother assessed to determine appropriate services because mother "had already done the things that [Cannon] would have asked."

{¶ 18} According to LCCS's files, the agency opened the 2018 case because one of the children was injured. There were no allegations that mother failed to provide medical care or enroll the children in school. Cannon did not see any type of diagnostic or psychological assessment of mother in the files and was unaware of any assessments finding that mother needed additional services. As far as Cannon knew, mother had complied with services in the earlier cases, and she always did what the agency asked of her "[t]o the best of her ability . . . ."

7.

{¶ 19} Cannon's biggest concern was mother's "cognitive ability to understand parenting." She recognized that mother had cognitive limitations the first time they met in person, but did not refer mother to services or seek any diagnostic assessments. Instead, she had mother sign a release for her records from the Lucas County Board of Developmental Disabilities, the agency that would assist a parent with cognitive disabilities. Mother did not qualify for the board's services. Cannon reviewed the school records in the board's file and noted that mother had an IEP. Records from mother's mental health provider showed that she had an appointment scheduled but had not yet been to any appointments. Cannon never spoke with anyone at the mental health agency.

{¶ 20} Regarding the coworker mother suggested as a placement for child, although the agency was ready to move forward with the placement, the caseworkers were told that they needed to consider a kinship placement with child's siblings first.

{¶ 21} The purpose of asking mother questions at the May staffing meeting was "to gauge what her understanding was as far as development and childhood needs and what a baby needs at this point." The topics covered included routine, sleeping, feeding, and developmental milestones like rolling over and crawling. The caseworkers thought that mother would have a better understanding of these concepts because she had raised children to toddlerhood before the family was involved with LCCS.

{¶ 22} Mother mentioned at the meeting that an argument she had with father made her "fearful," but Cannon was unsure of when that argument happened. There were no police reports indicating that there was domestic violence between mother and father.

8.

{¶ 23} Mother completed a parenting class while she was pregnant with child, was taking a different parenting class when Cannon was investigating this case, and had contacted another agency about participating in a third parenting class. Mother was willing to work with Help Me Grow, but the agency needed a referral from LCCS, which it could not provide until it knew what the case plan goals were. After speaking with someone at Help Me Grow, Cannon did not send a referral during the two weeks that LCCS was reviewing the case because, based on her conversation with the agency, she did not believe Help Me Grow would have accepted a referral before LCCS made its final determination about custody.

{¶ 24} Posey, the family's ongoing caseworker, testified that LCCS did not establish case plan services for mother because it only offers case plan services for the children when it seeks original permanent custody.

{¶ 25} Child was "doing really well" at foster mother's house. It was a "very loving home, [and] they care about her a lot." Child seemed happy, responded well to foster mother, seemed to have a good bond with foster mother, and was having all of her medical and developmental needs met. Child's interactions with her brothers, who foster mother had adopted, were positive.

{¶ 26} Posey had seen mother with child "a handful of times" at mother's supervised visits. She was very consistent with her visits, excited to see child, and "seems to love her daughter a lot, really care for her, [and is] very attentive to her." Posey received positive reports from the visitation monitors, too. At one visit, Posey asked mother to sign some papers on a clipboard while mother "was holding [child] and

9.

it felt like she had to like think about how am I going to hold my child and sign this paper . . . ." Posey held the clipboard for mother so that she could sign the papers.

{¶ 27} Mother was part of the Parent Empowerment Institute through LCCS. The facilitator of that group had observed mother at visits and did not have concerns about mother's interactions with child. Posey had also heard from an agency where mother took a coparenting class that mother was attentive in class, asked lots of questions, attended consistently, and was very engaged in the classes. Posey had not heard from the agency where mother said she was receiving counseling.

{¶ 28} Mother "has sometimes a hard time applying what she's learning and like fully understanding what is going on." That "raise[d] some red flags" for Posey regarding mother's "ability to parent and to keep a child safe." Mother's visits with child were at the highest level of supervision, which meant that the entire visit was observed by someone, and mother was "not really alone with the kid at all the entire time." Posey would be concerned if mother were allowed to see child in a less restrictive environment "because of the reports we have gotten of previous services that they have participated in when they had observations . . . ."

{¶ 29} LCCS was asking the court to grant it permanent custody of child, which Posey thought was in child's best interest.

{¶ 30} On cross, Posey testified that she reviewed the records from the service providers that mother told the caseworks about at the initial staffing meeting. Although mother asked Posey about services, she was "not offered case plan services so there is nothing [she was] required to do . . . ." Despite that, Posey told her that if a service is

10.

"going to make you better as a person, then that is a good thing to do." Mother talked to Posey about parenting classes, Help Me Grow, car seat safety, and a coparenting class, which were "all great suggestions for anyone that wants to be a better individual and a better parent." The agency would have offered the parents case plan services if LCCS had sought temporary custody rather than permanent custody.

{¶ 31} Posey said that mother "is really good at finding resources and finding service providers, finding the things that she needs." However, she "definitely struggles to understand various things, like maybe she's told something, interprets it one way, maybe needs to be told things a few different ways to fully understand and grasp it."

{¶ 32} Although Posey had reviewed LCCS's files on mother, she had not reviewed mother's mental health, educational, or other records related to her cognitive abilities. She gave the GAL all of mother's records. Mother had complied with anything LCCS asked her to do.

{¶ 33} The agency did not pursue a placement with the coworker mother suggested because it "believe[s] it's in the child's best interest to be in a home with her siblings."

{¶ 34} Street, Posey's supervisor, testified that she participated in the May staffing meeting. At the meeting, the caseworkers explained to mother "a few times" what custody option they were going to recommend to the court. Mother told them that she was participating in services, willing to participate in services, and wanted to be able to parent child.

11.

{¶ 35} Street had "concerns" about mother's answers to some of the questions about "basic parenting type responsibilities" and said that mother struggled with some of the questions and gave some answers that "were not necessarily even close to even a time frame as to when some of those things that would be occurring in regard to a child's development would happen." As an example, Street said that mother's answer to a question about transitioning a baby to solid foods was "significantly off." Street could not remember mother's exact answer. She also said that mother had "some understanding" of what a routine was. When the caseworkers explained to mother that the questions they asked were related to topics that she would have learned and demonstrated through parenting classes, mother responded that she only completed the education part of the classes because "the children were not present for observations, . . ." and if the agency was "expecting her to learn these things, how would she be able to do that if she was only in the education portion of the parenting [class]." In response to questions about an incident during parenting class observations regarding a "child being on a table, mom not responding, [and] walking away from the child rather than taking the child off the table[,]" mother said that "the scenario did not go the way it was reported . . . . ."

{¶ 36} When they discussed mother's relationship with father, mother "expressed again some of the concerns and red flags that was [sic] reported earlier . . . ." She explained that she has allowed father to stay with her when he does not have a place to live. Street concluded that father has "kind of always been on and off living with [mother] and more so when he becomes homeless he would always gravitate towards

12.

her." Mother also told them that "she was hoping that the agency would have given her direction as to how to address [father] being in her home." Street told her that the agency could not give her direction on that and she would have to figure it out on her own. Street also explained that some of the red flags that mother described would make the agency consider father "unsafe" to be around child.

{¶ 37} Mother "is always very receptive to any information provided to her" and was able to "explain back to [Street in] her own words what she understood from the meeting."

{¶ 38} At the next staffing meeting in June or July, mother told the caseworkers about some things she had learned in her most recent parenting class, for example, that trauma affects a child's development and that she was supposed to support a baby's head and neck. Street thought that mother's responses "showed that she is able to absorb information . . . , but just that concern still lies about her being able to demonstrate . . . those same things that she's learning through behavior." Specifically, Street found mother's claim that she had just learned about needing to support a baby's head and neck concerning because mother had several other children whom she had parented for "some time" before her rights to them were terminated, and this information was "something that would have not been just then learned, it would have been something that she would have had knowledge of for some time in demonstrating that."

{¶ 39} Street also had some concerns about mother's understanding of her loss of custody of her other children. According to Street, mother "has made some statements that would lead somebody to believe that she doesn't necessarily grasp the situation as a

13.

permanent situation, . . ." despite saying that she "understands that they are adopted and they are living with somebody else and their [sic] somebody else's children." Mother had recently told some of the providers she contacted about services that "she's wanting to engage in their service to be able to get her children back, whereas at this point we are talking about a singular child."

{¶ 40} Additionally, mother told the caseworkers that she was making some changes to her life (that she asked them not to share), "trying to . . . wean herself from [father,]" and attending counseling.

{¶ 41} Ultimately, Street concluded that mother

> presents extremely well. She's able to . . . give the information as it's given to her; however, just even talking to her about . . . how she's able to demonstrate those things, she struggles with how to show that she's able to do those things. And I think that continues to be a barrier for [LCCS], and I think every time we have a conversation with her we're hoping that that's going to come to pass and unfortunately at this point it just has not.
>
> . . .
>
> I think that . . . if it was as much of a mental health issue as it was a parenting issue, I think that would be one thing, but because it's so heavily the parenting aspect it just makes it very difficult to be able to make a different recommendation at this point.

{¶ 42} On cross, Street said that mother "was able to verbally express that she understood by explaining what was said at . . ." the meetings. Mother told them that she wanted to participate in services and was willing to do any services that the agency or the court recommended. The caseworkers told her that participating in services "would always be beneficial," but the agency was not going to put services for her into the case plan. The parents would have been offered case plan services with a recommendation of

14.

reunification if the agency had sought temporary custody of child. LCCS was not withholding services from mother. Instead, "in this particular situation case plan services were not being offered officially, but that does not mean that case plan services cannot be taken, . . . or engaged in or completed."

{¶ 43} When the caseworkers asked mother about introducing solid foods, mother's "timeframe actually was pretty off" and was "significantly too early." Street did not recall giving mother a definition of "solid foods." When counsel asked Street how mother's answer about routines was wrong, Street could not "say if it was wrong or right" because she did not "remember what specific questions there were." The meeting lasted roughly 25 minutes and "several people" were asking mother questions.

{¶ 44} Street recognized that mother had some cognitive delays before the end of the meeting. Generally, LCCS would use a psychological evaluation to determine appropriate case plan services, but Street did not think that a referral for mother was "appropriate" because the agency was seeking permanent custody. Later, mother sent an email explaining that she tried to make an appointment for a psychological evaluation on her own, but the provider needed a referral from LCCS to proceed. The agency told her "[t]hat due to our recommendation for permanent custody we would not be referring her to have that done." She did not know why mother had not asked for or been offered some type of psychological evaluation in the prior LCCS cases.

{¶ 45} Street did not see any reports of problems during mother's visits. She thought that it was possible for a parenting class facilitator to observe parental

15.

interactions during supervised visits but was not sure if anyone had recently asked to observe mother's visits.

{¶ 46} Mother was able to absorb and repeat information she learned, but Street was concerned with her ability to put the things she learned into practice. The fact that this problem was "the nature of unfortunately all the cases . . ." and was still an issue "weighed heavily" in the agency's decision to recommend original permanent custody. LCCS considers "any progress that [a parent] made as well as the ability to demonstrate change, so not just compliance, . . ." in making custody recommendations. Street thought that mother's comment about trauma affecting a child's development was progress for her. Street agreed with the agency's decision to seek permanent custody of child.

### 2. Foster mother's testimony

{¶ 47} Foster mother testified that child was placed with the foster family when she was only a few days old. Foster mother knows mother through child's foster placement and because she has adopted three of mother's other children. Child's three brothers (foster mother's adopted sons) are very bonded with child and like to feed her, hold her, and play with her. Child is healthy and a "very happy baby." She smiles, coos at, and interacts with her brothers, which she "doesn't do [] with everybody." Mother's other two sons (who were not adopted by foster mother) have visited child and had positive interactions with her.

{¶ 48} Foster mother and her husband would adopt child if she were available. The two older brothers were also "very vocal" about wanting child to stay with them at foster mother's home. Although her adoption of the boys is "not legally an open

16.

adoption," foster mother sends mother updates about the children, allows her to visit them, and allows her and the boys to exchange messages, and would allow the same things with child.

{¶ 49} On cross-examination, foster mother said that mother's messages to the boys are appropriate and the only issue the boys bring up about visits is that mother "does not interact with them very much at all at visits."

### 3. GAL's testimony

{¶ 50} In his testimony, Brown, the GAL, said that he did not have any concerns about child's placement with foster mother. There had been an issue with foster mother's house being untidy and cluttered, but she had resolved the problem. Child was "[e]asily soothed" by foster mother. Brown had also seen child interacting with her youngest brother and said that he was "incredibly loving and he adores his little sister." He had not seen mother interact with child or been to mother's home.

{¶ 51} Brown recommended that the court award permanent custody of child to LCCS. This was in child's best interest because she was placed with her siblings in a home that could be a permanent placement. He reached his conclusion "based on [his] interactions as well as the totality of all the documentation . . ." that he reviewed. Nothing he heard at the hearing changed his recommendation. He did not think that mother could appropriately parent child "at this time."

{¶ 52} On cross, Brown admitted that he did not know whether mother had visited child regularly during the case. He did not contact any of the agencies that provided the parenting classes mother attended, the visitation supervisors, or any of mother's friends

17.

and family.  Although mother's coworker had contacted him, he learned from Posey "that alternative placement was no longer being sought by LCCS" because the coworker was not a kinship placement.  He agreed with the agency's position that child being with her brothers was "the least restrictive and best case scenario . . . ."

{¶ 53} He thought that someone could "[a]bsolutely" change.  Specific to mother's situation, he said, "I believe if there was a case plan . . . she would have met that standard; however, LCCS was not seeking alternative placement and therefore permanent custody seems more than recommended []."

### 4. Mother's testimony

{¶ 54} Mother testified that child was only a few months old at the time of the hearing.  She was able to visit child every week for two hours, and the visits were going "[g]ood."  At visits, mother would read to child, "bond with" her, and "play tummy time with her."  She is "very attentive to [child's] needs and well bonded with her . . . ."  She had called Posey to visits to ask her questions "quite a few times," but Posey would not stay "that long."

{¶ 55} Mother was in the hospital when the agency made the decision to put child in foster care.  She recalled the caseworkers saying that "they're going to place [child] under permanent custody and for [mother] to have custody they would have to review what [she had] done, and by what they heard they're going by permanent custody because [mother is] still not able to change the circumstances."  She understood that LCCS's issue with her was her disability, which she described as "a learning comprehension problem and reading and math in school."  Mother had an IEP while she 18.

was in school. Her accommodations included "work[ing] with [her] one on one to adapt to social skills [she] may need or help [her] with being able to do [her] schoolwork." Mother did not finish high school but later obtained an online high school diploma.

{¶ 56} Mother was enrolled in a parenting class when she gave birth to child. The agency offering the class told her that she had to wait to restart the class, but she did not know why. After that, she took parenting classes through the "Power Institute for Children Service." She had completed all but two of those classes and was going to make up the missed sessions. The instructor had been to three of her visits with child and did not express any concerns to mother. She thought that Posey had been at one of the instructor's visits.

{¶ 57} During the 2018 case, mother's case plan services included parenting classes, mental health counseling, a domestic violence class, and "parent interaction" with one of her sons. She completed all of the recommended services. LCCS did not offer her services in the 2022 case because her "[p]arental rights [were] being terminated due to other children not in [her] custody." LCCS did not offer her any services in this case, either.

{¶ 58} When mother asked Cannon about services, she told mother that she would have to check with the providers first. Cannon later referred mother to Posey instead of discussing services. When mother asked Posey about case plan services, "[s]he said it's good that you're doing all these services, but I stressfully say to you again that we are not looking to change recommendation, we're going with permanent, looking to adopt her." She could not remember if she asked Posey for the reason LCCS changed its complaint to

19.

seek original permanent custody, but said, "I do know myself why they keep going permanent, because of the history I have with other children, that I lost my children."

{¶ 59} Since LCCS opened the 2022 case, mother had independently sought out a parenting class that she did not fully complete because the provider could not observe her with her children. She has never refused to sign releases for LCCS or participate in case plan services, did not have a criminal record, and had her own home that she paid for. Father had not abused her since the conclusion of the 2022 case.

{¶ 60} Although LCCS says "a lot" that mother has a cognitive delay, she did not know if anyone at the agency had looked through her school records, and it had not given her any assessments.

{¶ 61} Regarding the parenting questions the caseworkers asked at the May staffing meeting, mother "told them a year old" when they asked about solid foods. No one at the meeting explained to her why they thought her answers were wrong. She thought that she had restrained her child in a car seat and said that the incident with a chair or table did not happen because she "would never like put [her] child on top of a table or a chair and just walk away."

{¶ 62} While this case was pending, mother learned about the signs of domestic violence and what to do if she saw them; the basics of child development, what is not safe for children, how to keep them safe in public, and about teaching and modeling appropriate behavior for them; and how to buckle a car seat through a car seat safety class the hospital recommended to her.

{¶ 63} Mother wanted the court to know that,

20.

besides my cognitive disability that I'm a good mom and parenting is not easy, and I'm going to parenting [classes] and trying to learn different things that I have not applied. My ability to show that I can and that I'm trying to learn how to keep my children safe, and I want them to know that I'm not a violent or unsafe mom or unfit and that I'm choosing better relationships and knowing what is not good of me and my kids and what is not safe for them.

. . .

[P]arenting is not easy and [] I'm a good mom, I'm not a bad parent and I've learned from my mistakes.

{¶ 64} On cross-examination, mother clarified that she had completed three parenting programs, and the Parent Empowerment Institute program would be the fourth.

{¶ 65} Regarding the coworker mother suggested as a placement for child, mother had known her "for about a few years since [mother] worked with her" but they were not friends. When LCCS's attorney asked how well mother knew the coworker, mother said, "Personally I didn't know her, I just know she had like a good personalty [sic]." Mother had been to the coworker's home, but had not seen her interact with children. When asked whether she was comfortable recommending a person that she only knew through work, was not a friend, and had not interacted with children around her, mother said, "Not as much because she's not family and I don't know how she would like address with her. . . . And who she would have her around." She thought it was "a good thing" that the brothers foster mother adopted "have a relationship with [child] and that they're bonding with them."

{¶ 66} Mother denied that father was living with her but said that "[h]e would stay over nights." After mentioning at the June or July staffing meeting that father was still

21.

staying with her "then as the agency [she] looked for [her]self he had to depart from [her], . . . ." so she told father to leave, and he was not staying with her at all.

{¶ 67} The trial court asked mother some questions about her support system. Mother said that she had "church family" for support. These people "say they're there for" mother if she "ever need[s] to talk or need[s] help with anything . . . ." Mother had used them as support during the 2022 case. When the court asked mother for an example of how she had used her support system, she said, "As a like help me if I need anything or like giving me support if I needed help with taking care of the child."

## C. Trial court's decision

{¶ 68} At the hearing to announce its decision, the trial court said that mother is "a very sweet, loving person" who "truly want[s] to parent [her] children." However, because the burden was on the parents to prove that awarding LCCS permanent custody was not in child's best interest by showing that they could take care of themselves and child, the court expected them to present evidence of "their support system, engagement in therapy, applying skills that they have been taught class after class, and secure a safe, approved home." Based on the information presented at the hearing, the court found that mother did not "overcome [her] burden." It explained that "[t]he child needs permanency and the conditions from the original removal still exist, despite placing checkmarks next to services received, there still remains no checkmarks where services are retained and used."

{¶ 69} In its judgment entry, the trial court found clear and convincing evidence that child could not be placed with the parents within a reasonable time and should not be

placed with the parents and awarding permanent custody to LCCS was in child's best interest.

**{¶ 70}** The court found under R.C. 2151.414(B)(1)(a) that child could not be placed with either parent within a reasonable time and should not be placed with either parent.

**{¶ 71}** In determining that child could not or should not be placed with mother, the court made findings under R.C. 2151.414(E)(1), (2), and (11).

**{¶ 72}** As to (E)(1), the court found that mother continuously and repeatedly failed to substantially remedy the conditions that caused child to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. Despite completing case plan services, mother "continues to struggle with applying what she has learned to parenting placing the child at continued risk to her safety."

**{¶ 73}** As to (E)(2), the court found that mother's intellectual disability is so severe that mother is unable to provide an adequate permanent home for child at the present time and, as anticipated, within one year after the permanent custody hearing. Mother had completed services in her other cases but had failed to be able to apply what she learned, and the caseworkers and GAL testified that mother has cognitive delays that make it difficult for her to safely parent child.

**{¶ 74}** As to (E)(11), the court found that mother had her parental rights to child's siblings involuntarily terminated and failed to produce clear and convincing evidence proving that she can provide a legally secure permanent placement and adequate care for child's health, welfare, and safety, notwithstanding the prior terminations. Despite

23.

completing parenting classes, mother struggles to apply what she has learned to provide a safe place for child.

{¶ 75} Finally, the court determined under R.C. 2151.414(D)(1) that it was in child's best interest to award LCCS permanent custody. Specifically, the court found under R.C. 2151.414(D)(1)(a) that child was placed in an appropriate foster home where her needs were being met, she was placed and bonded with her siblings, and the foster parents wanted to adopt her, which would allow her to grow up with three of her siblings and have a relationship with her other two siblings. It found under (D)(1)(d) that child deserves a legally safe, secure, and permanent environment that cannot be achieved without granting LCCS permanent custody. And it found under (D)(1)(e) that mother had her parental rights involuntarily terminated with respect to child's siblings and failed to prove by clear and convincing evidence that she could provide a legally secure permanent placement and adequate care for child despite the prior terminations.

{¶ 76} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of child to LCCS and terminated mother's parental rights.

{¶ 77} Mother now appeals, raising three assignments of error:

> I. The trial court abused its discretion when it found that mother had failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare and safety of the child, pursuant to R.C. 2151.414(E)(11).
>
> II. The trial court's finding pursuant to R.C. 2151.414(E)(1) that mother failed continuously and repeatedly to substantially remedy the

24.

conditions causing the child to be placed outside the child's home was not supported by clear and convincing evidence.

III. The trial court's finding pursuant to R.C. 2151.414(E)(2) that chronic mental illness, chronic emotional illness or intellectual disability of mother is so severe that it makes mother unable to provide an adequate permanent home for the children at the present time and, as anticipated, within one year after the court holds the hearing was not supported by clear and convincing evidence.

## II. Law and Analysis

{¶ 78} In her assignments of error, mother argues that the trial court's findings under R.C. 2151.414(E)(1), (2), and (11) are not supported by clear and convincing evidence, so the trial court abused its discretion by granting permanent custody to LCCS. She contends that (1) evidence that she has a high school diploma, does not receive services from the Board of Developmental Disabilities, and has taken additional parenting classes shows that she has not continuously and repeatedly failed to correct the circumstances causing agency involvement; (2) the trial court based its decision solely on her "apparent limited cognitive ability[,]" which does not demonstrate a chronic mental illness or intellectual disability; and (3) evidence that she has taken "significant steps" toward "changing her circumstances," separates herself from father "most of the time," and has stable housing rebutted the presumption of custody in (E)(11).

{¶ 79} Mother's first assignment of error—regarding the trial court's (E)(11) finding—is dispositive of this appeal.

## A. The law of permanent custody

{¶ 80} Revised Code 2151.353(A)(4) allows a children services agency to seek a disposition of permanent custody when it files a complaint alleging that a child is abused,

25.

neglected, or dependent. *In re L.K.*, 2022-Ohio-1857, ¶ 104 (6th Dist.). Under that section, when a trial court adjudicates a child abused, neglected, or dependent, it can grant permanent custody of the child to a children services agency only if the court determines that (1) at least one factor in R.C. 2151.414(E) is present, indicating that the child cannot be placed with one of the parents within a reasonable time or should not be placed with either parent, and (2) the factors in R.C. 2151.414(D)(1) show that granting permanent custody to the agency is in the child's best interest. *Id.* at ¶ 106. The court is not required to consider the factors in R.C. 2151.414(B) when the agency seeks permanent custody under R.C. 2151.353(A)(4). *Id.* at ¶ 104; *see also In re A.M.*, 2023-Ohio-1523, ¶ 6, fn. 4 (12th Dist.). The agency is not required to offer the parents case plan services or attempt to reunify the family when it seeks original permanent custody. *In re T.H.*, 2025-Ohio-344, ¶ 34 (6th Dist.).

{¶ 81} If the court finds that at least one of the factors in R.C. 2151.414(E) exists, it must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *Id.* at ¶ 39. The court's finding that *any* (E) factor exists is sufficient to support an award of permanent custody to the agency. *In re S.J.*, 2024-Ohio-5137, ¶ 29 (6th Dist.); *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.) ("[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent . . . .").

26.

**{¶ 82}** As relevant here, the court found that R.C. 2151.414(E)(1), (2), and (11) were applicable to mother. The statute provides:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the [permanent custody] hearing . . . ;

> . . .

> (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to [R.C. 2151.414, R.C. 2151.353, or R.C. 2151.415], . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E).

**{¶ 83}** After finding that at least one factor in R.C. 2151.414(E) applies, the court must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

**{¶ 84}** All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. *In re J.S.*, 2025-Ohio-17, ¶ 34 (6th Dist.). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief

that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 2004-Ohio-896, ¶ 14 (6th Dist.).

{¶ 85} The Ohio Supreme Court recently clarified the standard of review in permanent custody cases:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 11. Notably, the court rejected abuse-of-discretion review in these cases. *Id.* at ¶ 18.

{¶ 86} "The sufficiency of the evidence [standard] tests the adequacy of the evidence: a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law." *In re C.W.*, 2025-Ohio-282, ¶ 37 (10th Dist.), citing *Z.C.* at ¶ 13.

{¶ 87} In a manifest weight review, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.*, 2012-

28.

Ohio-3556, ¶ 20 (6th Dist.).  If the evidence is susceptible to more than one interpretation, we are bound to interpret it in a way that is consistent with the trial court's judgment.  *Z.C.* at ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984).  The trial court's determination that an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."  (Internal quotations omitted.)  *In re C.P.*, 2009-Ohio-2760, ¶ 10 (10th Dist.).  Therefore, we will not find a permanent custody decision against the weight of the evidence if it is supported by some competent, credible evidence in the record upon which the trial court could have formed a firm belief as to all of the essential permanent custody findings.  *In re I.H.*, 2020-Ohio-4853, ¶ 34 (6th Dist.).

## B. The trial court's R.C. 2151.414(E)(11) finding is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

{¶ 88} Mother first argues that the trial court abused its discretion by finding that she did not meet her burden under R.C. 2151.414(E)(11) because she has taken "significant steps" toward "changing her circumstances," separates herself from father "most of the time," and has stable housing.  Although LCCS recited many facts in response to this assignment of error, it did not make any arguments.

{¶ 89} A finding under R.C. 2151.414(E)(11) places the burden on the *parent* to present clear and convincing evidence proving that she can provide a legally secure permanent placement and adequate care for the child's health, welfare, and safety.  *In re N.J.*, 2023-Ohio-3190, ¶ 44 (6th Dist.).  The parent must "'essentially rebut a

29.

presumption that, because her parental rights were involuntarily terminated as to her other children, she is not a suitable parent for additional children.'" *In re M.M.*, 2023-Ohio-3963, ¶ 51 (6th Dist.), quoting *In re E.A.*, 2012-Ohio-5925, ¶ 14 (9th Dist.).

{¶ 90} In this case, trial court found that mother struggled to apply what she learned in parenting classes, which is supported by the caseworkers' testimony that (1) mother gave concerning answers to their parenting questions; (2) mother claimed to learn things during this case that she should have learned while parenting her older children or during the earlier LCCS cases (e.g., having to support a baby's head and how to properly secure a child in a car seat); and (3) at least two of the providers of mother's parenting classes (that had observed her with her children) expressed concerns about her ability to apply the lessons she learned. Mother also allowed father to stay with her despite their history of domestic violence, wanted LCCS to tell her how to address father being in her home, and did not respond to the "red flags" she saw in her relationship with father in a way that would keep child safe. Additionally, at the beginning of this case, mother suggested that child be placed with her former coworker but admitted that she "[p]ersonally [] didn't know" the coworker, had not seen the coworker interact with children, and seemingly chose the coworker as a placement for child because she has "a good personalty [sic]." There was also some evidence that mother did not understand that her efforts in this case would not help her regain custody of the four children who had been adopted.

{¶ 91} To counter LCCS's evidence, mother testified that she was trying to learn new skills that she could use to keep child safe, was choosing better relationships, had

some support from her church family, stopped letting father stay with her a month or two before the hearing, and knew that it was possible for her to regain custody only of child.

{¶ 92} Mother's evidence did not rise to the level of clear and convincing evidence that she can adequately care for child. She presented evidence that she has taken classes to improve her parenting skills, but did not present any evidence that she is able to retain and apply those skills—which was LCCS's primary concern. Nor did she rebut Cannon's testimony that the agencies where she attended parenting classes had concerns about her ability to put the skills she learned into practice, or the evidence that she claimed to learn parenting skills during this case that she should have learned from raising her other children or in earlier parenting classes. Additionally, although mother testified that she had not allowed father to stay at her home for the one to two months before the hearing, she told her caseworkers that she tended to let father stay with her when he was homeless, and father testified that he had a place to live at the time of the hearing. Finally, the fact that mother has stable housing is not enough to show that she can meet the standard of (E)(11). In short, it was *mother's* burden to show that she is capable of providing a legally secure placement and adequate care for child's health, welfare, and safety, *N.J.* at ¶ 44, and she simply failed to do so. Thus, the trial court's (E)(11) finding is supported by sufficient evidence.

{¶ 93} Further, the trial court's (E)(11) finding is not against the weight of the evidence. After weighing the evidence, the trial court found that mother's testimony was insufficient to show by clear and convincing evidence that she could provide a legally secure permanent placement and adequate care for child's health, welfare, and safety.

31.

The trial court was in the best position to evaluate the evidence and testimony, and we are bound to construe evidence that is susceptible to more than one interpretation in a manner consistent with the trial court's decision. *Z.C.*, 2023-Ohio-4703, at ¶ 14. The trial court's conclusion that mother did not rebut the presumption in (E)(11) is supported by some competent, credible evidence, so it is not against the manifest weight of the evidence.

{¶ 94} After thoroughly reviewing the record, we find that the trial court's determination that mother did not meet her burden under R.C. 2151.414(E)(11) is supported by sufficient evidence. There is some competent, credible evidence in the record supporting the trial court's (E)(11) finding, and we cannot say that the court lost its way and created a manifest miscarriage of justice by making that finding. Therefore, the trial court's decision under (E)(11) is not against the manifest weight of the evidence. Mother's first assignment of error is not well-taken.

### C. Mother's remaining assignments of error are moot.

{¶ 95} In her second and third assignments of error, mother challenges the trial court's findings under R.C. 2151.414(E)(1) and (2). A trial court's finding that *one* (E) factor applies to a parent supports an award of permanent custody to a children services agency. *S.J.*, 2024-Ohio-5137, at ¶ 29 (6th Dist.); *Carlos R.*, 2007-Ohio-6358, at ¶ 38 (6th Dist.). Because we have determined that the trial court correctly found that (E)(11) applies to mother, and mother failed to rebut the presumption in that section, her arguments about the court's other (E) findings are moot. *In re A.W.*, 2015-Ohio-407, ¶ 40 (6th Dist.); *In re A.H.*, 2020-Ohio-3102, ¶ 23 (1st Dist.). Therefore, mother's second and third assignments of error are not well-taken.

32.

### III. Conclusion

**{¶ 96}** We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's assignments of error are without merit.

**{¶ 97}** Therefore, the August 28, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                _____
JUDGE

Gene A. Zmuda, J.             

Charles E. Sulek, P.J.          _____
CONCUR.                             JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.