[Cite as *In re J.R.*, 2026-Ohio-1420.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

In re J.R., J.S., J.H.-R.

Court of Appeals No. {22}E-25-029
{22}E-25-030
{22}E-25-031
{22}E-25-033
{22}E-25-034

Trial Court No. 2022 JN 0028
2023 JD 0002
2022 JN 0029

**DECISION AND JUDGMENT**

Decided: April 20, 2026

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Zachary Dusza, for appellant, Mother, A.S.

Miles T. Mull, for appellant, Father, Ja.R.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} This matter is before the court on the consolidated appeal by Mother, A.S., and Father, Ja.R., from the judgment of the Erie County Court of Common Pleas, Juvenile Division, finding J.R. (d.o.b.5/3/2021), J.H.R. (d.o.b.10/25/2019), and J.S. (d.o.b.1/11/2023) dependent and granting permanent custody of the children to the Erie County Department of Job & Family Services (ECDJFS). Mother, A.S., appeals the

judgment as to J.R., J.H.R. and J.S. Father, Ja.R. appeals the judgment as to J.R. and J.H.R.[1] Because we find no error with the juvenile court's judgment, we affirm.

## II. Facts and Procedural Background

{¶ 2} ECDJFS first had contact with the family on May 5, 2022, after police responded to the residence to investigate reports of domestic violence between Mother and her sister. As police attempted to take Mother into custody, she resisted. In the struggle, Mother knocked J.R.'s highchair over while J.R. was seated in the chair. Police charged Mother with disorderly conduct, resisting arrest, and child endangerment.

{¶ 3} Following Mother's arrest, ECDJFS established a safety plan for J.R. and J.H.R., which required Mother to reside elsewhere and obtain a mental health assessment, but permitted Mother to have supervised contact with the children, to be monitored by Mother's family. Mother resided with her mother and siblings at the time of the incident. Father resided in Pennsylvania, and he had minimal contact with the children.

{¶ 4} In violation of the safety plan, Mother continued living in the home and had unsupervised contact with her children. On June 6, 2022, Mother was involved in another domestic incident with a sibling. Mother left for work that day, leaving the children in her family's care, but did not tell her family she was leaving. About two hours later, the family discovered the children in the room Mother shared with her children. The room was cluttered and unsanitary, with trash on the floor and clutter on the beds and in the

---

[1] Father was ruled out as parent and dismissed from the case No. 2023-JD-0002. No paternity was established for J.S.

2.

baby's crib. Upon returning home from work, Mother noticed the children had dirty diapers, she became upset, and she assaulted her younger brother prompting a call to police. Police charged Mother with misdemeanor assault against her younger brother, disorderly conduct, and child endangering.

## A. Complaint and Temporary Custody

{¶ 5} Based on the violation of the safety plan by Mother and her family, as well as the concerns over living conditions, ECDJFS requested temporary custody of J.R. and J.H.R., alleging the children were neglected and dependent. The juvenile court granted ECDJFS emergency temporary custody. Notice was served on Mother, in custody on her criminal charges, and on Father, listed as John Doe, by publication.

{¶ 6} On July 1, 2022, Mother appeared for the adjudication hearing and requested a continuance and appointed counsel. Father was identified as the putative father. The juvenile court continued the matter until July 22, 2022, and issued notice to Father. On July 22, 2022, Mother appeared with counsel for the adjudication hearing, admitted to dependency, and the ECDJFS withdrew allegations of neglect. The juvenile court found J.R. and J.H.R. dependent as defined by R.C. 2151.04, continued temporary custody with ECDJFS, and found reunification was appropriate as the permanency plan. Father did not appear for the hearing.

{¶ 7} Mother was provided with case plan services that included substance abuse and mental health screenings, anger management and batterers' intervention classes, and parenting classes. The concerns identified by ECDJFS included providing a safe and

3.

stable home environment, acquiring healthy coping skills, and eliminating the children's exposure to physical or emotional harm.

{¶ 8} On January 13, 2023, after the birth of J.S., ECDJFS requested temporary custody of J.S., and the juvenile court adjudicated J.S. dependent following a hearing. Mother's case plan was updated to include J.S.

{¶ 9} Father first appeared in the case and requested appointed counsel in March, 2023. Father began the investigation and home-study process in Pennsylvania, with that agency sharing information with ECDJFS.

{¶ 10} In April 2023, the three children were placed together in foster care.

{¶ 11} On May 9, 2023, ECDJFS filed a motion to extend temporary custody for the three children. The agency argued that an additional six months was necessary pursuant to R.C. 2151.415 and 2151.353, and that Mother had not remedied the concerns that brought the children into agency custody. The agency indicated it was preparing to file a motion seeking permanent custody.

{¶ 12} Mother's case progress review in May 2023 indicated she completed parenting and anger management classes but was inconsistent in attending counseling to address some significant mental health concerns. Furthermore, despite the classes, she continued to exhibit explosive behaviors and anger toward her children and agency staff, and Mother struggled to manage all three children together during her visitation times. Additionally, it was noted that Mother recently lost a job due to an alleged assault against her manager. Despite frequent job turnover, however, Mother remained consistently employed and had housing in May 2023.

4.

{¶ 13} In July 2023, Mother was arrested following a domestic dispute with one of her siblings in her mother's home and charged with disorderly conduct. That same month, after paternity was established for J.R. and J.H.R., Father was substituted as a party in case Nos. 2022-JN-028 and 2022-JN-029.

**B. Motion for Permanent Custody**

{¶ 14} On July 17, 2023, ECDJFS filed a motion seeking permanent custody of J.R., J.H.R., and J.S. As to all three children, the agency alleged that the children could not be placed with either parent within a reasonable time or should not be placed with the parents, the children had been in custody of ECDJFS for at least 12 of the last 22 months, and J.R. and J.H.R. are abandoned children as to Father and J.S. is an abandoned child as to the putative father, still unidentified. The agency further alleged that Mother and Father demonstrated a lack of commitment toward the children and an unwillingness to provide an adequate permanent home, and that it was in the best interest of the children to grant permanent custody to ECDJFS.

{¶ 15} Specific concerns raised in the ECDJFS motion included Mother's failure to maintain long-term employment, noting she has been fired twice for angry outbursts at work, and Mother's unimproved behaviors, with frequent outbursts, inability to de-escalate, and history of domestic violence that Mother failed to address through counseling. ECDJFS also noted concerns with Father, including his extensive criminal history including crimes of violence, child endangering, and drug trafficking, his lack of visitation with J.R. and J.H.R. in excess of 90 days, and his inability to provide a stable home. While Father had initiated the approval process for Father's housing in

5.

Pennsylvania, the housing had neither been approved nor denied at the time of the agency's motion.

{¶ 16} Father filed his own motion seeking legal custody of J.R. and J.H.R. on August 16, 2023. Father argued his paramount right to his children as biological father, that he is a fit person to have custody and was not involved in the actions that resulted in removal from the home, and he possesses the resources to care for his children

{¶ 17} In August/September 2023, Father was added to the case plan and provided case plan services. Concerns expressed by ECDJFS included Father's extensive criminal history and multiple convictions. The case plan included mental health and drug/alcohol screenings and treatment, parenting classes after three months of consecutive positive progress reports from treatment providers, successful completion of a batterers' intervention program, obtaining stable housing and employment, and having no new criminal charges.

{¶ 18} On September 29, 2023, ECDJFS requested an additional six-month extension of temporary custody pursuant to R.C. 2151.415 and 2151.353. Although neither Mother nor Father had made significant progress in addressing the agency's concerns, ECDJFS indicated an extension was necessary to "establish alternate permanency" and an extension was in the best interests of the children.

{¶ 19} In June 2024, Mother was arrested for another incident and charged with disorderly conduct. The charges arising from this incident remained pending at the time of the dispositional trial held on October 4, 2024.

6.

### C. Trial

{¶ 20} Mother and Father both appeared for the trial with counsel, with Father appearing by videoconference. ECDJFS introduced testimony of Jamie Matso, the ongoing caseworker for the children, Brihanna Pickens, a visitation specialist for ECDJFS, and Mary Anne Mitchell, volunteer coordinator for Erie County CASA and the assigned CASA for the case. In addition, ECDJFS questioned Mother and Father on cross-examination. Mother and Father also testified, and their respective attorneys questioned the agency's witnesses on cross examination.

### 1. Jamie Matso, Caseworker

{¶ 21} Jamie Matso testified regarding her experience working with the family for two years, beginning four months after the agency obtained temporary custody in June 2022. Matso testified regarding the incidents that led to ECDJFS involvement, including the arrests in May and June of 2022. She testified that Mother clearly loves her children and they are bonded to her, but Mother's primary issues are her inability to control her emotions and anger and her financial instability.

{¶ 22} In addressing these issues, Mother completed several mental health and substance abuse screenings but did not complete the recommended counseling, and Mother was unsuccessfully terminated from counseling three times. Mother attempted to complete a batterers' intervention program twice but was terminated the first time after she stopped attending and terminated the second time after an inappropriate interaction with staff, with the program paused until Mother made more progress with her mental

7.

health. Mother was prescribed medications through psychiatric services, but refused to take medication, believing it was not needed.

{¶ 23} Since May 2024, Mother was engaged in counseling with a new provider, but because she self-referred, the new provider did not have all the information necessary for Mother's case plan. Even with successful completion of some of her services, however, Mother's behavior did not change, and ECDJFS had continuing concerns regarding her parenting because of her continued, explosive behaviors.

{¶ 24} These same behaviors were exhibited in Mother's interactions with ECDJFS staff, on the phone and in-person. When Mother could not control her emotions, she yelled and cursed at staff and walked out of meetings with ECDJFS. Mother also demonstrated a lack of understanding of her issues, believing her family was to blame for ECDJFS taking custody of the children and that Mother had no responsibility for what happened.

{¶ 25} As to Mother's contact with the children, Matso testified she observed about 30 percent of Mother's visits with the children, and Mother was not appropriate. Mother would raise her voice and get physical during the visits. On one occasion, staff observed Mother grabbing J.R. by the neck of his shirt, leading to a call for a supervisor; on another occasion, Matso observed Mother pinning J.R. against a couch by his chest and grabbing J.R. by his arm to try to keep him from running. However, Matso never observed Mother physically strike her children.

{¶ 26} Matso also testified regarding Mother's work history, noting Mother had at least eight jobs in the two-year period in which Matso worked with Mother. Matso

testified that Mother did not stay at a job for more than a couple of months, but there were small gaps in employment as Mother always found a new job quickly. Mother told Matso that she did not like people telling her what to do or did not enjoy working with her coworkers, as an explanation for the many job changes. Mother lost at least one job after an incident with a coworker.

{¶ 27} Mother's unstable employment history led to issues with housing. Matso indicated that Mother had lived in four different locations during the case and was not financially able to afford rent. At the time of trial, Matso was unsure where Mother lived, but believed that Mother lived with a friend for about a month. Matso requested the address, but Mother never provided one. Matso tried to assist Mother with transportation and housing and offered to obtain a parenting advocate for Mother, but Mother only accepted help with transportation and Mother's history of evictions narrowed her housing options. Mother declined the parenting advocate.

{¶ 28} Matso's involvement with Father was brief, as Father did not have a case plan until August or September of 2023. Father's issues were identified as mental health, substance abuse, parenting skills, and anger management. Father also had past charges for child endangering and drug trafficking. Matso worked with the Pennsylvania agency who completed a home study for Father, but Father did not complete any case plan services. Matso asked Father to complete a release at least six times; Father never provided any releases and was difficult to contact. Just before trial, Matso spoke with one of Father's counselors who confirmed Father had completed a substance abuse screening, but Father had not engaged in the recommended counseling.

9.

{¶ 29} As to Father's contact with the children, only the oldest recognized him and Father's visits were few and limited to the months of November and December 2023, with more than a 90-day lapse in contact both before Father was added to the case plan and after. At the time of trial, Father no longer lived at the address that had the approved home study, and Matso had no information about Father's new address and could not comment on the appropriateness of the home. Father was also on disability and unable to work due to having "been shot in the knee."

{¶ 30} Finally, Matso testified about the children, indicating she visited the foster home monthly and observed all three, and they are bonded to their foster family. The foster family, however, has not agreed to adopt and are not a permanent placement option. Matso testified that J.R. has no special needs but J.H.R. has "some pretty significant behavioral concerns" and receives occupational therapy and play therapy. J.S. is developmentally delayed and is getting an autism assessment. Matso's biggest concerns are J.S.'s delays and behaviors.

{¶ 31} Matso also testified that the children are bonded with Mother and Mother demonstrated an attachment to all three children. However, despite the love the children have for their mother and the love Mother has for her children, the children cannot be safely reunited with Mother because Mother has not addressed her mental health, which has worsened in the two years Matso has been involved in the case. Mother also has trouble maintaining housing and employment for more than a few months at a time.

{¶ 32} As to Father, Matso testified that only J.H.R. knows who Father is, and Father demonstrated no attachment to the children. Father has also demonstrated no

willingness to complete his case plan services, even if Father was given more time to complete services. With no appropriate kinship placements for the children, Matso testified that permanent custody for ECDJFS is in the best interest of the children.

{¶ 33} On cross-examination, Matso acknowledged that the charges in some of Mother's earlier cases were dropped, and there was no outcome in the most recent case, which was scheduled for trial the next month. Matso also acknowledged that Mother tried many mental health providers without success but was presently treating at Ohio Guidestone and seemed to be consistent with her attendance at counseling in the weeks leading up to trial. As to housing, Matso testified that she tried to help Mother secure housing, but Mother's history of evictions limited Mother's available housing options.

{¶ 34} Matso also agreed that the Pennsylvania agency was aware of Father's history and recommended only mental health and drug/alcohol assessments and treatment for Father, and that ECDJFS added other services to Father's case plan based on a background check performed by ECDJFS. Matso acknowledged that Father told her he completed a batterers' intervention program while in prison, but she could not verify that completion and Father provided no releases to access information.

## 2. Brihanna Pickett, Visitation Specialist

{¶ 35} Next, Brihanna Pickett testified. Pickett is a visitation specialist for ECDJFS and supervised visits between Mother and the children. Pickett was familiar with J.R., J.H.R., and J.S. and supervised about 50 of Mother's visits. After each visit, Pickett prepared a narrative, summarizing her observations of the visit. Pickett indicated that Mother was not always consistent in attending her visitation time or calling to let

ECDJFS know she could not attend. Mother was also late for visits, requiring cancelation, which caused the children to spend more than three hours in a car, to and from the agency, for a visit that did not occur. As a result, ECDJFS placed Mother on a call-in policy to confirm the visit each time. When Mother called in too late and learned the visit was cancelled, Mother often became frustrated with Pickett, sometimes yelling and cursing at Pickett on the phone. After Mother failed to consistently follow the call-in policy, the agency required her to appear for her visits one and a half hours early, which helped resolve the issue.

{¶ 36} Pickett did acknowledge, however, that Mother has "gotten better at that" more recently, referencing attendance and punctuality. Mother was placed back on the call-in policy and was consistent in attendance. Pickett also testified that Mother improved in her knowledge of what the children needed during the visit, such as things a parent would pack in a diaper bag for an outing, compared to her earlier visits when she did not come prepared but expressed the belief that she paid child support so should not have to come for her visit with extra items for the children.

{¶ 37} As to Mother's interactions, Pickett noted Mother loses patience and "tends to get a little bit irritable or frustrated" and "tends to yell" loudly at the children when they do not follow her directions. Mother's irritation, then, causes the children to get "a little bit more wound up." Pickett testified that the children reflected Mother's yelling and loud talking; when they heard Mother getting louder, "they tend to get louder or scream or cry." Pickett acknowledged, however, that the children generally mind Mother "very well." In the instances when they did not mind, Pickett observed Mother "grab them

12.

pretty quickly" but never saw Mother hit the children. Instead, Mother turned to "ranting and yelling" when she was frustrated. Additionally, Mother cursed and yelled at staff, but "not in front of the children directly."

{¶ 38} Pickett testified that sometimes Mother could de-escalate the children's behaviors or her own, and other times she could not, requiring intervention. On a couple of occasions, Pickett needed to call her supervisor to intervene and calm Mother, and Pickett knew of instances in which another visitation specialist needed to end Mother's visits early. Based on her observations, Pickett opined that Mother lacked an understanding of age-appropriate behaviors for children, noting Mother expected her two older children, aged three and five, to watch the baby, and did not understand that children that age often do not like to share toys. Pickett also witnessed J.H.R. hiding under the bathroom counter in response to Mother's yelling, which frightened the child.

{¶ 39} Finally, Pickett testified regarding Father's visitation. She indicated Father had one in-person visit and he "played well with the children." Father arranged video visits afterward and had three or four weekly visits by video. After missing a few visits, Father was placed on a call-in policy, and after failing to call in repeatedly, Father was taken off the visitation calendar, and had been off the calendar "since January, February."

### 3. Mary Anne Mitchell, CASA

{¶ 40} Next, ECDFJS presented the testimony of Mary Anne Mitchell, a volunteer coordinator with the Erie County CASA program. Mitchell trains CASA volunteers and has her own cases. Mitchell testified that she took over the children's cases from the prior assigned CASA, was familiar with the entire file, and had been working on the case

13.

during the six months before the trial. Mitchell understood that Mother's case plan goals included addressing her mental health, engaging in consistent visitation, and appropriately dealing with the children. Mitchell observed some of Mother's visits with the children and had safety concerns based on Mother's behavior and her inability to focus on more than one thing or person at a time.

{¶ 41} Mitchell testified regarding Mother's aggression and mental health issues and noted Mother's prior conviction for child endangering as well as charges for domestic violence. Based on her observation of Mother during visitation, she also described instances when Mother seemed unable to care for all three children at the same time, often splitting her attention or needing a reminder that she had to take the children with her if she left the room to use the restroom. Mitchell had no contact with Father but knew her predecessor had made many attempts to contact Father with no response.

{¶ 42} Mitchell prepared a report and recommendation, advocating permanent custody as in the best interest of the children. Mitchell based this recommendation on untreated mental health issues, lack of visits or behavior during visits, lack of stable employment and housing, and Mothers' anger issues. She also noted Mother's prior conviction for child endangering involving one of the children, and Mother's pending charges following the June 2024 incident. Mitchell had no contact with Father but noted he had not attempted visitation since December 2023 and demonstrated no efforts with his case plan.

14.

### 4. Mother

{¶ 43} ECDJFS then called Mother to testify on cross-examination. Mother, through her counsel, objected to testifying and asserted her right against self-incrimination based on the pending criminal charges. The juvenile court overruled her objection, with an instruction to avoid questions that would elicit testimony regarding "any pending criminal charges."

{¶ 44} Mother testified she is 25 years old and currently employed through a temporary agency, with a factory placement for the past week. Mother acknowledged the prior testimony regarding her many job changes, admitting she left jobs for better pay or based on personality differences with coworkers. Mother admitted she often quit jobs by no longer showing up after she found a new job.

{¶ 45} As to the reason ECDJFS obtained temporary custody of J.R., J.H.R., and J.S., Mother acknowledged her anger issues and mental health issues but framed the cause for temporary custody as her focus on taking care of everyone and earning money and neglecting herself. Mother also testified that she understood the need to complete her case plan but also stated she did not understand how "this all works," referencing the case plan and the process and her frustration with the agency that took her children away.

{¶ 46} Mother expressed skepticism regarding the anger management and batterers' intervention programs, indicating the anger management program did not teach her anything she did not already know and the batterers' intervention program was mostly unrelated to her own circumstances. Mother did admit that she would approach the case plan process with more calm, if she could go back and begin again.

15.

{¶ 47} Mother acknowledged she had mental health hospitalizations, "maybe about like four," but admitted herself to seek treatment, with no recent hospitalizations. Mother also acknowledged she suffers from borderline personality disorder and depression but disputed her diagnoses for schizoaffective disorder and bipolar depression. Mother admitted she refused to take any prescribed medications to treat her mental health conditions.

{¶ 48} Next, Mother testified that, while Father is a good babysitter, she did not believe he could parent the children and, if she did not get custody, the court should not award custody to Father. Mother testified that her current housing did not have room for the children, but if she were to have custody of the children, she planned to take them to her father's house in Pennsylvania; he had a five-bedroom house and room for everyone. Mother also acknowledged that her father was considered for placement but was denied "because of his background from years ago."

{¶ 49} On direct, Mother testified about her unstable childhood and being labeled an angry child, stating she was not angry, she "just needed something different" and struggled to find a treatment provider that could help. She testified that she is happy with her current therapist and is in a better mental state. Mother testified regarding how much she loved her children and wanted them back.

## 5. Father

{¶ 50} Finally, Father was questioned on cross-examination. He testified he lives in Pennsylvania and resides with his current wife and her children, as well as his son. He no longer lives with the same people in the home that was approved for placement. Father

also admitted he was unavailable for case plan meetings with Matso and did not timely return Matso's calls or emails. Furthermore, Father testified that the lack of signed releases was due to a miscommunication between his therapist and Matso.

{¶ 51} Father explained the lack of visitation as another miscommunication. Father indicated his missed video visits with J.R. and J.H.R. were due to the difficulty of video calls. He also testified that he did not request a resumption of video visits because ECDJFS told him his video calls were terminated and his failure to reinstate visits was due to miscommunication. Father admitted to going to prison "a few times," maybe "three or more" times, and he remained on parole and unable to leave Pennsylvania until a year before trial.

{¶ 52} For his own case, Father testified that he wants custody of his children, and he has a place for the children to live in Pennsylvania. Father also testified that he has extended family in Pennsylvania and can provide for his children.

{¶ 53} At the close of testimony, ECDJFS admitted exhibits, including the CASA report.

### D. Magistrate's Decision and Objections

{¶ 54} The magistrate issued his decision on January 9, 2025, finding a grant of permanent custody to ECDJFS was in the best interest of the children. The decision was based on findings that J.R. and J.H.R. had been in ECDJFS custody since June 6, 2022 and J.S. had been in ECDJFS custody since January 13, 2023, well in excess of 12 of the last 22 months, and consistent with R.C. 2151.414(B)(2) and (E), the children cannot be placed with Mother or Father within a reasonable time. Specifically, Mother

17.

demonstrated a lack of commitment to the children by failing to provide an adequate permanent home, failing to maintain stable employment, refusing to take prescribed medication for her multiple mental health diagnoses, failing to address her behaviors or comprehend the need for anger management or batterers' intervention programs and having a prior conviction for child endangering in which a child or sibling of the children was the victim. Additionally, Father abandoned the children in that he did not visit the children from June 2022 to November 2023, and last visited with the children in December 2023, he moved from the home approved by the Pennsylvania agency, had limited to no engagement with case plan services, and failed to adequately address any concerns in his case plan.

{¶ 55} Mother filed an objection to the magistrate's decision, and the juvenile court granted the parties 30 days to file briefs. Mother filed a brief, challenging the decision and arguing an abuse of discretion in applying the best interest factors under R.C. 2151.414(D). Mother argued that her bond with the children was stronger than the bond with foster care workers, and the testimony demonstrated that the foster family was not a permanent placement option. Mother also argued that she has demonstrated consistent improvement and the evidence showed she can address the issues identified within her case plan within a reasonable time, resulting in reunification. Finally, Mother argued the magistrate violated her Fifth Amendment right against self-incrimination, based on the pending criminal charges at the time of trial even though those charges have since been dismissed by the State.

18.

{¶ 56} In response, ECDJFS argued that the record demonstrated Mother's inability to modify her behaviors, her refusal to take prescribed medications, and her lack of stable housing and employment, with the record containing clear and convincing evidence to support the magistrate's findings. Additionally, ECDJFS argued that the magistrate protected her Fifth Amendment right against self-incrimination by limiting the questioning to avoid matters related to the criminal proceedings, and no incriminating statements were elicited through cross-examination.

{¶ 57} Father filed no objections.[2]

**E. Juvenile Court Judgment**

{¶ 58} On June 23, 2025, the juvenile court entered judgment on the objection filed by Mother. The court first addressed Mother's claim of violation of her Fifth Amendment right against self-incrimination. In rejecting Mother's claim, the juvenile court noted that the magistrate limited questioning and ECDJFS asked no questions related to the criminal allegations. Therefore, Mother's rights were not violated, as the law protected Mother from having the testimony used against her in criminal proceedings, the juvenile case was a civil proceeding, and Mother otherwise provided voluntary, unconditional testimony in her case in chief.

---

[2] Juv.R. 40(D)(3)(b) provides for objections to the magistrate's decision and provides that a failure to file an objection waives all but plain error as to the court's adoption of factual findings or legal conclusions. Juv.R. 40(D)(3)(b)(iv). Pursuant to Juv.R. 40(D)(4)(c), if no objections are filed, "the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision."

19.

{¶ 59} The juvenile court further overruled Mother's objections regarding the permanent custody determination but did find that an incorrect statutory section had been applied. The court determined ECDJFS had satisfied R.C. 2151.414(B)(1)(a) as the appropriate statutory provision to award permanent custody to the agency.

{¶ 60} After ruling on Mother's objections, the juvenile court terminated the parental rights of Mother and Father and granted permanent custody of J.R., J.H.R. and J.S. to ECDJFS

{¶ 61} Mother and Father each filed a timely appeal of the judgment.

### III. Assignments of Error

{¶ 62} Mother asserts the following assignments of error:

1. The trial court abused its discretion in awarding permanent custody of the minor children herein to Appellee.

2. The trial court violated [Mother's] constitutional rights against self-incrimination.

{¶ 63} Father asserts the following assignments of error:

1. The trial court erred in finding that Father had abandoned the children pursuant to R.C. 2151.414(B)(1)(b).

2. The trial court erred in finding that Father failed to remedy the conditions that caused the child's removal pursuant to R.C. 2151.414(E)(1).

3. The trial court erred in finding that Father has demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with the children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children pursuant to R.C. 2151.414(E)(4).

20.

4. The trial court erred in finding that it must grant the Agency's Motion for Permanent Custody of the Children pursuant to R.C. 2151.414(D)(2).

For ease of discussion, we address Mother's Fifth Amendment challenge, first, and consider the remaining assignments of error raised by Mother and Father jointly.

## IV. Analysis

### A. Fifth Amendment Challenge

{¶ 64} In her second assignment of error, Mother argues that the juvenile court violated her right against self-incrimination by forcing her to testify at the dispositional trial. At the time of trial, Mother had pending criminal charges arising from the June 2024 incident. The juvenile court overruled Mother's objection to being called on cross-examination, but limited questioning to avoid any testimony regarding matters at issue in the criminal proceedings.

{¶ 65} "The privilege to refrain from compulsory self-incrimination as guaranteed by the Fifth Amendment to the Constitution of the United States " 'can be claimed in any proceeding, be it criminal or civil, administrative or adjudicatory * * *. [I]t protects any disclosures which the witness may reasonably apprehend could be used in the criminal prosecution or which could lead to other evidence that might be so used.' " *In re Amanda W.,* 124 Ohio App.3d 136, 140 (6th Dist.1997), quoting *In re Gault*, 387 U.S. 1, 47–48 (1967) (additional citation omitted.).

{¶ 66} While a witness may refuse to take the stand in a criminal proceeding, however, the privilege against self-incrimination does not permit a witness to refuse to

21.

answer any questions in an adjudicatory proceeding. *In re L.M.,* 2011-Ohio-1585, ¶ 53 (11th Dist.), citing *Tedeschi v. Grover,* 39 Ohio App.3d 109, 111 (10th Dist.) (additional citation omitted.). Instead, a witness must invoke the Fifth Amendment privilege against self-incrimination on a question-by-question basis. (Citations omitted) *State ex rel. Dewine v. Buckeye Impact Group, LLC,* 2018-Ohio-4578, ¶ 7 (6th Dist.).

{¶ 67} Here, Mother invoked her right against self-incrimination as a basis to avoid being called as a witness. The juvenile court overruled her objection and limited questioning to avoid any incriminating matters. On appeal, Mother identifies no improper questions and incriminating statements that were elicited at the trial. Furthermore, the record demonstrates no questions asked regarding any pending criminal proceeding.

{¶ 68} In determining applicability of the privilege, the standard is "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Matter of A.W.,* 2022-Ohio-1553, ¶ 20 (11th Dist.), quoting *Marchetti v. United States*, 390 U.S. 39, 53 (1968). Based on this record, Mother identifies no testimony she was compelled to provide for which privilege applied. At best, Mother refers to "matters and issues linked to said charges that could conceivably been used against her in future criminal proceedings" and argues that the existence of criminal charges affected "the way [Mother] testified," without more to establish application of the privilege. Considering the record, there is no basis to determine Mother's privilege against self-incrimination applied to any of her testimony. Accordingly, we find Mother's second assignment of error not well-taken.

22.

## B. Permanent Custody Determination

{¶ 69} In Mother's first assignment of error and Father's first, second, third, and fourth assignments of error, Mother and Father challenge the juvenile court's termination of parental rights. Mother argues the juvenile court abused its discretion, challenging the juvenile court's findings after applying the statutory factors. Father challenges the factual findings by the juvenile court as not supported by clear and convincing evidence.

{¶ 70} A court may grant permanent custody only upon demonstration of factors under R.C. 2151.414, based on clear and convincing evidence. *In re E.D.-P.,* 2026-Ohio-1294, ¶ 23 (6th Dist.). As pertinent in this case, the juvenile court was required to find that the children could not be placed with either parent within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a), and that permanent custody to ECDJFS was in the best interests of the children, R.C. 2151.414(D). In assessing whether the children could be or should be placed with the parents within a reasonable time under R.C. 2151.414(B)(1)(a), the juvenile court was required to consider the factors under R.C. 2151.414(E). *In re I.D.,* 2014-Ohio-238, ¶ 26 (6th Dist.), citing *In re B.K.,* 2010-Ohio-3329, ¶ 43.

{¶ 71} An award of permanent custody under R.C. 2151.353(A)(4) must be supported by clear and convincing evidence. *In re I.H.,* 2020-Ohio-4853, ¶ 33 (6th Dist.), citing *In re B.K.,* 2017-Ohio-7773, ¶ 16 (6th Dist.) (additional citation omitted). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the

23.

trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 471 (1954), paragraph three of the syllabus.

{¶ 72} The appellate standard of review for permanent custody determinations is sufficiency of the evidence or manifest weight of the evidence, depending on the nature of the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. In this case, Mother and Father challenge the weight, and not the sufficiency, of the evidence. Accordingly, we will not reverse the judgment on permanent custody as against the manifest weight of the evidence where the record contains some competent, credible evidence by which the court could have formed a firm belief as to the essential statutory factors for termination of parental rights. *In re Denzel M.*, 2004-Ohio-3982, ¶ 8 (6th Dist.).

{¶ 73} The juvenile court first determined that R.C. 2151.414(B)(1)(a) applied, or that "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." Mother and Father do not challenge this finding. As to Father, specifically, the juvenile court made an additional finding under R.C. 2151.414(B)(1)(b), that "[t]he child is abandoned." Father disputes this finding.

{¶ 74} Mother and Father both dispute the juvenile court's findings under R.C. 2151.414.(E), and both dispute the findings under R.C. 2151.414(D) concerning the best interests of the children. We address each disputed factor in turn, noting the individual arguments of Mother and Father.

24.

**1. Abandonment, R.C. 2151.414(B)(1)(b) – Father**

{¶ 75} In his first assignment of error, Father argues the evidence did not support the finding that J.R. and J.H.R. are abandoned. Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 76} In arguing a lack of credible evidence regarding abandonment, Father acknowledges the testimony that placed all his visits between November and December, 2023, but argues that "conflicting" testimony also suggested one contact sometime between the period of June 2022 and his case plan in August 2023. Father does not identify this one contact with any clarity, and Father references no evidence in the record establishing a date for his one contact.

{¶ 77} At best, Father cited evidence that demonstrated his intention to work toward reunification, including his efforts toward obtaining a home study and case plan services. However, Father's involvement in the proceedings is not the equivalent of "visitation or maintenance of contact" with his children. *See In re L.Z.,* 2013-Ohio-2939, ¶ 13, citing *In re M.B.,* 2009-Ohio-2634, ¶ 54 (7th Dist.). Father, moreover, admitted in his testimony that he had not visited his children for over two years.

{¶ 78} Considering the record, there was clear and convincing evidence demonstrating Father abandoned J.R. and J.H.R., and the juvenile court's finding is supported by the manifest weight of the evidence.

{¶ 79} Father's first assignment of error is not well-taken.

25.

**2. Remedying Conditions, R.C. 2151.414(E) – Mother and Father**

{¶ 80} In Mother's first assignment of error and Father's second and third assignments of error, they challenge the juvenile court's findings under R.C. 2151.414(E).

{¶ 81} R.C. 2151.414(E) addresses the determination of whether a child cannot or should not be placed with a parent within a reasonable time, considering all relevant evidence. *See* R.C. 2151.414(E). "If the court determines, by clear and convincing evidence, at a hearing held pursuant to … division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." The juvenile court determined the following sections under R.C. 2151.414(E) applied:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code; (15) The parent has committed abuse as described in section

26.

2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

…

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

…

(7) The parent has been convicted of or pleaded guilty to one of the following:

…

(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

{¶ 82} Mother challenges the juvenile court's findings under R.C. 2151.414(E)(1), (2), (4), and (7)(c). Father challenges the findings under R.C. 2151.414(E)(1) and (4). The juvenile court's finding as to any one of the factors under R.C. 2151.414(E) is sufficient to support the conclusion that the children cannot or should not be placed with Mother and Father within a reasonable time. *In re T.H.,* 2025-Ohio-344, ¶ 41 (6th Dist.), citing *In re S.J.,* 2024-Ohio-5137, ¶ 29 (6th Dist.) (additional citation omitted.).

{¶ 83} First, Mother and Father argue that the evidence did not support the finding under R.C. 2151.414(E)(1), that they failed to substantially remedy the conditions causing removal from the home, based on their attempts to complete case plan services. In support, Mother argues her perceived failures amounted to "trivial matters" without addressing her continuing anger issues or failure to secure stable employment and

27.

housing. Father argues that he could not fail to remedy conditions because he did not cause those conditions, having no custody of the children leading up to temporary custody with ECDJFS, and Father obtained an approved home study upon entering an appearance in the proceedings. Neither Mother nor Father, however, argue that the record supported a finding that the children could be placed with either parent within a reasonable time.

{¶ 84} Instead, the record demonstrated that Mother completed some of her case plan services, but this did not result in a change of behavior. Mother continued to exhibit explosive behaviors and continued to engage in conduct that resulted in criminal charges. Father, on the other hand, did not engage in case plan services through ECDJFS, but obtained a home study from the Pennsylvania agency and then left the approved home. At the time of trial, ECDJFS had no access to any counseling records and no information regarding Father's current home.

{¶ 85} Considering the record, therefore, we find the juvenile court's findings under R.C. 2151.414(E)(1) are supported by clear and convincing evidence as to Mother and Father.

{¶ 86} Next, Mother challenges the findings under R.C. 2151.414(E)(2), arguing her testimony admitting to various mental health diagnoses and refusal to take prescribed medications did not clearly and convincingly demonstrate an inability to provide a home for her children. As noted by Mother, ECDJFS presented no evidence that causally linked Mother's diagnoses with an inability to provide an adequate home for her children. *See In re Alexis K.,* 2005-Ohio-1380, ¶ 44 (6th Dist.) (no evidence demonstrating mental health

28.

condition was so severe it prevented parent from providing appropriate home for children). As to this factor, therefore, the juvenile court's finding is not supported by clear and convincing evidence. However, as the juvenile court's finding as to any one of the factors under R.C. 2151.414(E) is sufficient, our finding as to R.C. 2151.414(E)(2) is not dispositive. *See In re T.H.* at ¶ 41.

{¶ 87} Mother and Father next argue that the juvenile court's finding under R.C. 2151.414(E)(4) lacks evidentiary support. As to Mother, she argues her visitation began inconsistently, but she improved over time and was regularly visiting with the children and communicating with the foster parents in the months prior to trial. Pursuant to R.C. 2151.414(E)(4), however, the juvenile court considered visitation as well as "other actions showing an unwillingness to provide an adequate permanent home for the child."

{¶ 88} Here, Mother's visits were inconsistent at first, leading ECDJFS to place conditions on Mother to call in or arrive early before the visit could be confirmed with the children. Mother's behavior during visits, moreover, was often inappropriate, as Mother continued to exhibit the anger that contributed to the children's removal from the home. And while Mother's attendance improved to the point where some conditions were lifted, Mother continued to demonstrate difficulty parenting all three children and had made little progress in providing an appropriate home for the children. Furthermore, Mother continued to react to her children and to everyone involved in the case with explosive outbursts of temper or frustration and was often unable to de-escalate without intervention. In addition to Mother's attendance at visitation, her other actions demonstrated an unwillingness to provide an adequate home. *See, e.g., In re Carlos R.,* 29.

2007-Ohio-6358, ¶ 13 (6th Dist.) (failing to obtain employment despite offers of assistance to achieve this goal demonstrated unwillingness); *In re D.A.,* 2012-Ohio-1104, ¶ 36 (6th Dist.) ("a parent's unwillingness to utilize services provided him may demonstrate a basis for a finding under R.C. 2151.414(E)(4)"). Based on the record, therefore, the juvenile court's finding was supported by clear and convincing evidence.

{¶ 89} The record also supported the juvenile court's finding as to Father. While Mother did maintain visitation with the children, Father's visits were few and restricted to November and December 2023. Furthermore, while Father argues he worked diligently with the agency in Pennsylvania, the record demonstrated little effort to work with ECDJFS. Combined with Father's other actions that showed an unwillingness to provide an adequate permanent home based on his lack of communication with ECDJFS and failure to engage with case plan services, the record supported the finding under R.C. 2151.414(E)(4) as to Father.

{¶ 90} Mother next challenges the juvenile court's finding under R.C. 2151.414(E)(7)(c), arguing there was no evidence of her conviction for child endangerment. However, ECDJFS presented testimony by Mitchell, the CASA, regarding Mother's no contest plea and subsequent conviction for child endangerment, and the same information was included in ECDJFS exhibit 3, the CASA report, admitted without objection. Therefore, the juvenile court's finding under R.C. 2151.414(E)(7)(c) is supported by clear and convincing evidence.

{¶ 91} Accordingly, we find Mother's first assignment of error challenging the finding that Mother failed to remedy conditions that led to removal from the home under

the R.C. 2151.414(E) factors not well-taken. We further find Fathers' second and third assignments of error, challenging the juvenile court's findings under R.C. 2151.414(E) not well-taken.

### 3. Best Interests of the Children

{¶ 92} In Mother's first assignment of error and Father's fourth assignment of error, Mother and Father challenge the juvenile court's findings regarding the best interests of the children. After addressing the motion for permanent custody under R.C. 2151.414(B) and (E), the juvenile court considered the second finding necessary to grant permanent custody pursuant to R.C. 2151.414(D), which provides:

> (1) In determining the best interest of a child …the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

31.

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

(2) If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 93} The juvenile court's findings regarding the best interests of the children included a finding that Mother and children shared a strong bond, but no such bond was present between Father and J.R. and J.H.R. The court further noted that the children were too young to express their wishes and the children had been in ECDJFS custody for over two years, with J.S. in foster care since birth. The juvenile court determined that all three children need a legally secure placement that cannot be achieved without granting the motion for permanent custody, as the children could not be placed with either parent within a reasonable time and no other placements or appropriate relative placements had been identified.

32.

{¶ 94} The juvenile court then determined under R.C. 2151.414(D)(2) that one or more of the factors under R.C. 2151.414(E) had been demonstrated by clear and convincing evidence, the children had been in the agency's custody for two years or longer, the children did not meet the requirements for a planned permanent living arrangement based on their age, and prior to the dispositional hearing, no appropriate relative or other interested person had been identified.

{¶ 95} On appeal, Mother challenges the CASA's recommendation on behalf of the children, arguing the CASA had been involved for only six months prior to trial and never visited Mother's home or conducted an independent investigation, relying instead on her predecessor's investigation and reports. Mother also challenges the finding that permanent custody was necessary to provide the children a legally secure permanent placement, arguing no investigation was done to determine whether Mother's plan to relocate with the children to Pennsylvania or placing the children in Father's home in Pennsylvania, which was approved for temporary placement, was an appropriate alternative to permanent custody. Finally, Mother argues that none of the factors under R.C. 2151.414(E) applied.

{¶ 96} Considering the record, the juvenile court's findings are supported by clear and convincing evidence. The CASA's testimony and report support her recommendation, and as previously addressed, the evidence demonstrated no error in the juvenile court's findings under R.C. 2151.414(E)(1), (4), and (7)(c). Furthermore, the record demonstrated Mother's desire to move the children to her father's home in Pennsylvania would not have been possible, as her father had already been determined as

33.

not appropriate as a placement. Father, moreover, had moved from his approved placement and no new home study was requested for his new residence.

{¶ 97} Father challenged the findings based on his argument that the juvenile court erred in finding R.C. 2151.414(E)(1) and (4). Father also argues that the agency in Pennsylvania investigated and provided a report and recommendation for placement with Father. The Pennsylvania agency, however, also recommended Father complete certain case services prior to placement of the children in his home. Father moved from the approved home and failed to demonstrate completion of any case services, either in Pennsylvania or Ohio. Father failed to even attend his case plan meeting with ECDJFS and waited until just prior to the trial to contact ECDJFS about his case plan. Considering the record, Father's argument lacks merit, as the record contains clear and convincing evidence to support the juvenile court's findings under R.C. 2151.414(D)(2).

{¶ 98} Upon careful review of the juvenile court's findings, the statutory factors, and the record in this case, we find no error regarding the best interest of the child findings in this case. Therefore, having determined the juvenile court's findings are supported by clear and convincing evidence as to the required considerations under R.C. 2151.414(E) and (D), we find Mother's first assignment of error not well-taken. We further find Father's fourth assignment of error not well-taken.

34.

## V. Conclusion

**{¶ 99}** Finding substantial justice has been done, we affirm the judgment of the Erie County Court of Common Pleas, Juvenile Division.  Mother and Father are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.           _____
                                             JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, J.          _____
CONCUR.                                         JUDGE

_____
                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.